UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case No. _____

**CIV-KING**

Alberto Justo Rodriguez Licea, Fernando
Alonso Hernandez, and Luis Alberto Casanova
Toledo,

      Plaintiffs,

v.

Curaçao Drydock Company, Inc., a/k/a
Curaçaose Dokmaatschappij NV, a/k/a
CDMNV,

      Defendant.

_____/

**JURY TRIAL DEMANDED**

MAGISTRATE JUDGE
GARBER

## COMPLAINT

### INTRODUCTION

1.    This case concerns a conspiracy realized between the government of Cuba and

the Defendant in this case, Curaçao Drydock Company, Inc. ("Curaçao Drydock Company"),

a ship repair company, to force Cuban citizens to travel to drydock facilities owned by the

Defendant in Curaçao, to hold them in captivity there, and to force them to work repairing

ships and oil platforms belonging to, *inter alia*, U.S. companies. Since the early 1990s, Cuba

and Curaçao Drydock Company have held hundreds of Cubans in captivity in Curaçao and

forced them to work. Curaçao Drydock Company paid the Cuban government directly for

labor that it knew was unlawfully compelled from Cuban citizens. The victims, including

Plaintiffs Alberto Justo Rodriguez Licea, Fernando Alonso Hernandez, and Luis Alberto

Casanova Toledo, were threatened that if they refused to work, they would be imprisoned in Cuba.

## NATURE OF THE ACTION

2.      This Complaint seeks compensatory and punitive damages from Curaçao Drydock Company for directly compelling labor from Plaintiffs by force and threat of physical and psychological harm, and for collaborating with the Cuban totalitarian state to compel labor from Plaintiffs by force and threat of physical and psychological harm in violation of the law of nations, as well as numerous other torts.

3.      This case is brought in a United States court for several reasons. First, the Plaintiffs are Florida residents. Plaintiffs escaped their bondage in Curaçao, survived a harrowing adventure, and made their way to a third country. Recognizing their plight, the United States government granted each of them a Significant Public Benefit Parole visa to legally enter the United States.

Plaintiffs cannot bring this action in Curaçao, where Cuban agents operate and where the government was likely aware of and acquiesced in Plaintiffs' subjugation. Cuban agents would capture Plaintiffs if they returned to Curaçao.

Nor can they bring this action in Cuba, from which they are exiled. There are no free and fair courts or rule of law in Cuba. Further, Cuba, emblematic of its outlaw status, does not outlaw forced or bonded labor, but rather uses forced labor both to generate foreign currency and punish dissidents in violation of international law.

While no other forum exists, U.S. law specifically grants U.S. district courts jurisdiction to hear actions brought by aliens to remedy violations of international law such as those alleged here.

## PARTIES

4.      Plaintiffs are citizens of Cuba and legal residents of the United States.

5.      Defendant Curaçao Drydock Company, Inc., a/k/a/ Curaçaose

Dokmaatschappij NV, a/k/a/ CDMNV is a corporation organized under the laws of Curaçao,

Netherlands Antilles and doing business in the United States through its agent Klattenberg

Marine Associates, Inc., a Florida Corporation registered to do business and doing business

at 933 NW 26th Avenue, Delray Beach, Florida.  Defendant openly identifies Klattenberg

Marine Associates, Inc. as its agent in Florida and transacts substantial and not isolated

business in Florida and throughout the United States through Klattenberg Marine Associates,

Inc.'s Delray Beach office.

6.      Through Klattenberg Marine Associates, Inc. and/or other contacts in Florida,

Defendant sold ship repair services that were performed by Plaintiffs under force.

7.      Defendant is a wholly owned subsidiary of Curaçaose Dok Maatschappij

Holding NV.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

8.      This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §1331

(federal question jurisdiction), 28 U.S.C. § 1350 (Alien Tort Statute), 18 U.S.C. § 1964(c)

(Racketeer Influenced and Corrupt Organizations Act) and 28 U.S.C. §1367 (supplemental

jurisdiction).

9.      The Alien Tort Statute provides jurisdiction in U.S. District Courts for "any

civil action by an alien for a tort only, committed in violation of the law of nations or a treaty

of the United States."

10.     The principal tort committed by the Defendant – forced labor – constitutes a violation of a well-established, universally recognized norm of international law, *i.e.*. the law of nations.

11.     Forced labor is widely recognized as one of the handful of claims for which the Alien Tort Statute provides jurisdiction in United States district courts regardless of where the forced labor occurred.

12.     Defendant violated norms of international law against forced labor and thereby, by its own actions, has subjected itself to claims for redress for those actions in any United States district court that can exercise personal jurisdiction over it.

13.     This Court has supplemental jurisdiction over the remaining claims alleged herein.

### Personal Jurisdiction and Venue

14.     This Court has personal jurisdiction over the Defendant pursuant to Fla. Stat. § 48.193(1)(a), Fla. Stat. 48.193(2), or, alternatively, Federal Rule of Civil Procedure (4)(k)(2).

15.     This Court has specific personal jurisdiction over Defendant pursuant to Fla. Stat. § 48.193(1)(a) because Defendant operated, conducted, engaged in or carried on the business of providing drydock services to companies located in Florida, and has an office or agency in Florida for that purpose, and this action arises from the conduct of the business of providing Cuban forced laborers to satisfy contracts for drydock services entered into in Florida.

16.     Additionally, this Court has general personal jurisdiction over Defendant pursuant to Fla. Stat. § 48.193(2) because it is engaged in substantial and not isolated activity

4

within Florida, including maintaining an agent that acts on its behalf in Florida, and makes extensive sales of its drydock services within Florida. Defendant's business activity in Florida is continuous and systematic.

17. Alternatively, this Court has personal jurisdiction over Defendant pursuant to Federal Rule of Civil Procedure 4(k)(2). Rule 4(k)(2) provides that:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Rule 4(k)(2) provides for the exercise of jurisdiction over defendants sued under the Alien Tort Statute, as is the case here, so long as they are served and so long as they have aggregate minimum contacts with the United States as a whole. *Mwani v. bin Laden.* 417 F.3d 1 (D.C. Cir. 2005)(jurisdiction over Osama bin Laden for Alien Tort Statute claims of Kenyans killed by bombs in Kenya, even though those bombings did not trigger long-arm jurisdiction under any state long-arm statute).

18. The Defendant has aggregate minimum contacts with the United States as a whole due to its extensive business selling drydock services to the United States cruising. shipping and petroleum industries. The Defendant continually makes contacts with the United States, including entering the United States, making sales to the United States. maintaining an agency in the United States, and maintaining membership in U.S. business organizations. Upon information and belief, Curaçao Drydock Company has joined industry associations in the United States in an attempt to penetrate the United States market and increase its contacts here. These associations include the National Association of Marine Products and Services and the Industrial Union of Marine and Ship Building Workers of

America.

19.     Defendant has purposefully made itself subject to the jurisdiction of the courts and the laws of the United States, including the Alien Tort Statute.

20.     The Plaintiffs are Florida residents. Plaintiffs escaped their bondage in Curaçao and were offered safe haven by the United States. On or about February 8, 2006, the United States Government, recognizing their plight, granted each of them a Significant Public Benefit Parole visa to allow them to legally enter the United States.

21.     In addition to the explicit statutory grant of jurisdiction in the Alien Tort Statute, the United States' longstanding interest in personal liberty and the rule of law make this Court a proper venue for this suit.

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 (c), which allows for venue in the judicial district in which a corporation is subject to personal jurisdiction, and 28 U.S.C. 1391 (d), which provides that, "An alien may be sued in any district."

### STATEMENT OF FACTS

### Curacao Drydock knew that Cuba is a totalitarian state that abuses the rights of and compels labor from its citizens under threat of imprisonment in inhumane prisons

23.     Cuba is a well-known totalitarian state and abuser of human rights. The United States Department of State Country Report on Human Rights for Cuba ("State Department Report") states:

> Cuba, with a population of 11 million, is a totalitarian state led by a president, Fidel Castro, whose regime controls all aspects of life through the Communist Party (CP) and its affiliated mass organizations, the government bureaucracy, and the state security apparatus. Although civilian authorities generally maintained effective control of the security forces, the Ministry of Interior is the principal instrument of state security and control, and officers of the Revolutionary Armed Forces, which are led by the president's brother, have occupied most key positions in the ministry during the past 15 years.
>
> The government's human rights record remained poor, and the government

continued to commit numerous, serious abuses. At least 333 Cuban political prisoners and detainees were held at year's end. The following human rights problems were reported:

- denial of citizens' rights to change their government
- beatings and abuse of detainees and prisoners, including human rights activists, carried out with impunity
- transfers of mentally healthy prisoners to psychiatric facilities for political reasons
- frequent harassment of political opponents by government-recruited mobs
- extremely harsh and life-threatening prison conditions, including denial of medical care
- arbitrary arrest and detention of human rights advocates and members of independent professional organizations
- denial of fair trial, particularly to political prisoners
- interference with privacy, including pervasive monitoring of private communications
- severe limitations on freedom of speech and press
- denial of peaceful assembly and association
- restrictions on freedom of movement, including selective denial of exit permits to thousands of citizens
- refusal to recognize domestic human rights groups or to permit them to function legally
- domestic violence, underage prostitution, and sex tourism
- discrimination against persons of African descent
- severe restrictions on worker rights, including the right to form independent unions

*United States Department of State, Country Reports for Human Rights Practices. 2005.*

*Cuba* at  http://www.state.gov/g/drl/rls/hrrpt/2005/61723.htm.

24.    At all times relevant to this Complaint, Curaçao Drydock Company knew that Cuba is a totalitarian state that abuses human rights.

25.    Cuba has a long history of forced labor and routinely compels labor with threat of imprisonment in violation of international law.  Despite the fact that forced labor contravenes international legal norms, the Cuban state and Cuban law do not prohibit it.

26.    At all times relevant to this Complaint, Curaçao Drydock Company knew that Cuba had a long history of forced labor and that Cuba routinely compels labor under threat of

imprisonment in violation of international law.

    27.    Anyone who resists performing work for the state according to the socialist

model is subject to persecution in Cuba. According to the State Department Report:

> The law provides that all legally recognized civil liberties may be denied to anyone who actively opposes the decision of the people to build socialism.

*United States Department of State, Country Reports for Human Rights Practices, 2005.*

*Cuba* at  http://www.state.gov/g/drl/rls/hrrpt/2005/61723.htm.

    28.    Cuba also imposes prosecutions or therapy and reeducation at police

discretion for the Orwellian crime of "potential dangerousness" on those who refuse to work

for the state according to socialist norms. The refusal to work is converted into a criminal

offense punished with or without process of law. The State Department Report states:

> The Penal Code includes the concept of "potential dangerousness," defined as the "special proclivity of a person to commit crimes, demonstrated by his conduct in manifest contradiction of socialist norms." If the police decide that a person exhibits signs of dangerousness, they may bring the offender before a court or subject him to therapy or political reeducation. Government authorities regularly threatened prosecution under this provision.

*United States Department of State, Country Reports for Human Rights Practices, 2005.*

*Cuba* at  http://www.state.gov/g/drl/rls/hrrpt/2005/61723.htm.

    29.    The Cuban government imprisons those who refuse to work at worksites.

According to the State Department Report:

> The law does not prohibit forced or compulsory labor by adults. The government maintained correctional centers for persons convicted of such crimes as "dangerousness" (see section 1.a.). Prisoners held in such centers were forced to work on farms or at sites performing construction, agricultural, or metal work. The authorities also often imprisoned persons sent to work sites who refused to work.

*United States Department of State, Country Reports for Human Rights Practices, 2005.*

*Cuba* at http://www.state.gov/g/drl/rls/hrrpt/2005/61723.htm.

    30.    At all times relevant to this Complaint, Curaçao Drydock Company knew that

Cuba compels its citizens to work, uses outrageous, Orwellian means to persecute anyone who exhibits any type of resistance to the will of the state, and imprisons those it sends to worksites who refuse to work.

31.     At all times relevant to this Complaint, Cuba gained a substantial portion of its foreign currency from joint ventures with foreign corporations, some of which rely on forced labor. Cuba is particularly concerned with the uninterrupted flow of foreign currency from its joint ventures with foreign corporations and so is particularly harsh on anyone who resists working in them.

32.     At all times relevant to this Complaint, Curaçao Drydock Company knew that Cuba gained a substantial portion of its foreign currency from joint ventures with foreign corporations, and that Cuba is particularly concerned with the uninterrupted flow of foreign currency from its joint ventures with foreign corporations, and so is particularly harsh on anyone who resists working in them.

33.     Cuba's prisons are particularly inhumane and dangerous. According to the State Department Report:

> Prison conditions continued to be harsh and life threatening. Conditions in detention facilities also were harsh. Prison authorities frequently beat, neglected, isolated, and denied medical treatment to detainees and prisoners, particularly those convicted of political crimes or those who persisted in expressing their views. Authorities also often denied family visitation, adequate nutrition, exposure to natural light, pay for work, and the right to petition the prison director.
>
> Prisoners sometimes were held in "punishment cells," which usually were located in the basement of a prison, with continuous semi-dark conditions, no available water, and only a hole for a toilet. Reading materials, including Bibles, were not allowed. Prison officials regularly denied prisoners other rights, such as the right to correspondence. Some prison directors routinely denied religious workers access to detainees and prisoners.
>
> In November the Cuban Commission for Human Rights and National Reconciliation denounced the worsening health of dozens of political prisoners, stating that more prisoners suffered from dangerous diseases due to the "generally subhuman and degrading conditions" in which they were

held.

*United States Department of State, Country Reports for Human Rights Practices. 2005. Cuba* at http://www.state.gov/g/drl/rls/hrrpt/2005/61723.htm.

34.     At all times relevant to this Complaint, Curaçao Drydock Company knew that workers that the Cuban government provided to it would be compelled under threat of imprisonment in Cuba's prisons, that Cuba's prisons are particularly inhumane and dangerous, and that the treatment of those who refuse to work, especially in a forced labor program that generates foreign currency for the Cuban state, is particularly harsh both because refusal to work is deemed to be an expression against the Revolution and thus a threat to the state, and because the Cuban regime is propped up by the foreign currency that forced labor schemes involving foreign companies generate.

**Curaçao Drydock Company conspired with Cuba to engage in forced labor**

35.     With this knowledge, Curaçao Drydock Company entered into a conspiracy with the Cuban government under which the Cuban government would provide forced laborers to Curaçao Drydock Company at its facilities in Curaçao and co-manage those workers with Curaçao Drydock Company.  This arrangement shall be referred to herein as the "Curaçao Drydock Operation".

36.     At all times relevant to this Complaint, Curaçao Drydock Company knew that the Cuban laborers that the Cuban government provided to it were not free individuals but subjects of the Cuban totalitarian regime who were compelled to perform the will of the Cuban state under threat of various means of repression including imprisonment.

37.     Curaçao Drydock Company paid Cuba, a known practitioner of forced labor, directly for the labor of the Cuban laborers, including Plaintiffs.

10

38.     The Curaçao Drydock Operation was a closely integrated joint venture between the Cuban government and Curaçao Drydock Company.

39.     At all times relevant to this Complaint, Cuban national Manuel Bequer Soto del Valle ("Manuel Bequer") was in charge of the Curaçao Drydock Operation and was the supervisor of Plaintiffs.

40.     Manuel Bequer is an employee of Curaçao Drydock Company.

41.     Manuel Bequer is a member of the senior management staff of Curaçao Drydock Company. His title at Curaçao Drydock Company is Production Manager.

42.     Manuel Bequer's aunt is Dalia Soto del Valle. Dalia Soto del Valle is the wife of Fidel Castro. Manuel Bequer is thus Fidel Castro's nephew. At all times relevant to this Complaint, Fidel Castro was President of the Council of State, Prime Minister of the Council of Ministers, Commander in Chief of the Armed Forces, and First Secretary of the Communist Party of Cuba. Through violence and threat of violence, Fidel Castro exercises power and dominion over all property and all persons in the Cuban nation.

43.     Manuel Bequer holds his position with Curaçao Drydock Company because of his ability to commandeer forced Cuban labor under color of authority of the Cuban state.

44.     As a Cuban national and as a member of Fidel Castro's family, Manuel Bequer at all times knew that the Cuban laborers worked for Curaçao Drydock Company and in the Curaçao Drydock Operation under threat of physical and psychological harm.

45.     Cuban agents traveled to Curaçao to help oversee the forced laborers in the Curaçao Drydock Operation on the premises of Curaçao Drydock Company.

46.     Rosana Grau, the head of personnel for the Curaçao Drydock Operation, was a Cuban national and a security agent of the Cuban government.

47.     Rosana Grau was responsible for ensuring that Plaintiffs and the other forced laborers could not escape.

48.     At all times, Curaçao Drydock Company knew that Rosana Grau and other agents of the Cuban government watched and threatened the Cuban laborers to prevent them from escaping and to extract labor from them. The Curaçao Drydock Operation maintained an atmosphere of fear and intimidation to repress Plaintiffs and the other forced laborers.

49.     Curaçao Drydock Company also took direct measures to ensure that the Plaintiffs and the other Cuban forced laborers could not escape, including keeping them in a secure physical area, watching them and hiring security personnel to monitor them.

50.     During the time periods relevant to this Complaint, from approximately 1991 to the present, the Curaçao Drydock Operation typically held approximately 50-100 Cubans captive in Curaçao and subjected them to forced labor. Cuba and Defendant Curaçao Drydock Company would typically rotate workers in and out of the Curaçao Drydock Operation.

51.     Although the Cuban laborers were intermittently sent back to Cuba, in Cuba, they were subjects of the totalitarian Cuban state and were not free to migrate or express any dissent. Nor were they free to refuse the wishes of the Defendant and the Cuban state that they return to the Curaçao Drydock Operation.

### Plaintiffs' specific allegations

52.     Plaintiffs were ordered to work for the Curaçao Drydock Operation by Cuban government agents or instrumentalities, and by Curaçao Drydock Company acting with the backing of the threats of the Cuban government.

53.     In August, 1995, Plaintiff Fernando Alonso Hernandez was ordered by

Curaçao Drydock Company, acting with the backing of the threats of the Cuban government, to travel the next day to begin work in Curaçao Drydock Company's facilities there. Mr. Alonso Hernandez knew that he had no choice but to go, and that if he had resisted going that it would have resulted in the persecution of him and his family by the Cuban state.

54.     In or about December, 2001, Plaintiff Alberto Justo Rodriguez Licea was called to a meeting with the Cuban Ministry of Transport. At this meeting, an official of the Ministry of Transport told him and others present that they were being sent the next day to Curaçao to work for Curaçao Drydock Company there. Mr. Rodriguez Licea knew that he had no choice but to go, and that if he had resisted going that it would have resulted in the persecution of him and his family by the Cuban state.

55.     In or about February, 2002, Plaintiff Luis Alberto Casanova Toledo was ordered by Curaçao Drydock Company, acting with the backing of the threats of the Cuban government, to travel the next day to begin work in Curaçao Drydock Company's facilities there. Mr. Casanova Toledo knew that he had no choice but to go, and that if he had resisted going that it would have resulted in the persecution of him and his family by the Cuban state.

56.     At all times relevant to this Complaint, Cuba maintained an atmosphere of intimidation and fear that made it impossible for Plaintiffs to refuse orders made by the Cuban government or those speaking with its backing.

57.     In order to intimidate them and ensure that they did not resist the specific orders that they go to work in Curaçao, Cuban government officials repeatedly told Plaintiffs and the other Cuban laborers that the work they were being sent to do in Curaçao was important to the Revolution, as it was a source of hard currency for the Cuban government. When Cuban government officials stressed the importance of working in the Curaçao

Drydock Operation to the Revolution, they were employing code words that carried the full threats of the Cuban totalitarian state.

58.    Plaintiffs were rotated in and out of the Curaçao Drydock Operation. Each Plaintiff was held captive and forced to work in Curacao for a total of several years or more between 1995 and 2005.

59.    Plaintiffs could not refuse initially going or returning to Curaçao to work in the Curaçao Drydock Operation without facing serious repercussions, including imprisonment.

60.    There was no employment contract between Plaintiffs and Defendant or between Plaintiffs and the Cuban government or any Cuban government agency.

61.    Before they left for Curaçao, Plaintiffs were made by Cuban government officials to sign a document stating that Plaintiffs would work 44 hours per week in the Curaçao Drydock Operation. This document stated that they would work six days per week with one day off. Plaintiffs signed this document under duress. Specifically, Plaintiffs knew that if they refused to sign it, the Cuban government would consider them to be opposed to the Revolution and a threat to the revenue stream that came from the joint venture with Curaçao Drydock Company and persecute them.

62.    The document Plaintiffs were forced to sign was a sham. At the time that this document was presented to Plaintiffs, Defendant and Cuba, as well as many of the Cuban workers, including those that had already worked in the Curaçao Drydock Operation, knew that the terms regarding limits on the amounts of hours Plaintiffs would be made to work were not true. Defendant and Cuba made the representations regarding the number of hours worked in order to have paperwork that would make it seem as if the entire operation were

legitimate, the workers were not forced, and the Cuban laborers had some protections under a contract. In fact, the entire Curaçao Drydock Operation was illegitimate, the workers were forced both to sign the documents and to work, and the workers enjoyed no protections under any contract.

63.     Defendant knew that any and all documents that it procured directly or that the Cuban government procured for it were procured by fraud, or under threat of the totalitarian state's repressive tactics, including threat of imprisonment.

64.     The document that Plaintiffs were forced to sign did not state that Plaintiffs were going to be paid and did not state any rate of pay.

65.     The Cuban government informed Plaintiffs orally that it would pay them approximately 400 non-convertible Cuban pesos per month for their labors. This amounted to approximately $16 per month. Given that the Plaintiffs worked over 110 hours per week, the effective rate of pay was between 3 and 4 cents per hour.

66.     The Cuban government also told Plaintiffs that they would receive a *per diem* of $12 for 28 days per month while in Curaçao.

67.     The Plaintiffs were not free to do anything other than accept what was given them by the Cuban state, including the *per diem* and the approximately 400 Cuban pesos per month. To refuse would have constituted a political expression against the Revolution and the forced labor scheme, and resulted in Plaintiffs' persecution.

68.     The Plaintiffs were not compensated according to the hours that they were forced to work or according to the salary terms of any employment agreement. The Plaintiffs performed the work under threat of physical and psychological harm, including the threat of imprisonment in Cuba.

69.     Each and every time that Plaintiffs arrived in Curaçao, representatives of the Cuban government and the Curaçao Drydock Operation met them immediately after they passed through immigration controls at the border and seized their passports. The Defendant and/or its co-conspirators seized Plaintiffs' and the other Cuban laborers' passports in order to restrict their liberty and to discourage attempts to escape either within Curaçao or from Curaçao.

70.     The Plaintiffs gave up their passports because they knew that if they did not heed the request of a Cuban government official or representative of the Curaçao Drydock Operation for their passports, that they would be subjected to persecution, including imprisonment. Plaintiffs were transported directly to the secure facilities of Defendant.

71.     Once they were within the Defendant's secure facilities, Plaintiffs were not allowed to leave the facilities, except when accompanied by security personnel from the Curaçao Drydock Operation.

72.     Plaintiffs and the other Cuban laborers were instructed by overseers of the Curaçao Drydock Operation to inform on each other if any of them attempted to escape or discussed plans to escape.

73.     After the Plaintiffs were in Curaçao, the threats against them became more specific. Agents of the Curaçao Drydock Operation told Plaintiffs in plain terms that if they refused to work according to the arbitrary demands of the Defendant, that they would be sent back to Cuba and imprisoned.

74.     Plaintiffs were forced to work on ships and oil platforms that, based upon the writings upon their hulls, belonged to U.S.-based companies and organizations including major cruise lines headquartered in Miami, major oil companies, major shipping and

agricultural companies, and others.

75.     The typical daily schedule that the Plaintiffs and the other Cuban laborers were forced to work was from 3 p.m. to 7 a.m., or a 16-hour day.

76.     The Plaintiffs' typical week consisted of 112 hours of hard labor, followed by a second week of 112 hours of hard labor, without a day off.  The Plaintiffs and other Cuban laborers were consistently forced to work for more than 15 consecutive days without a day off.  When a ship or oil platform came into the drydock, Plaintiffs were forced to work as many consecutive days as it took to finish its cleaning and repairs.  If there were a ship in another drydock, they would move immediately to work on it.  They were only allowed to rest if all the drydocks were empty, which rarely happened.   Plaintiffs were not only forced to work the 44 hours stated as the limit in the document that Plaintiffs were forced to sign, Plaintiffs were forced to work an *additional* 70 to 80 hours per week for no pay and under threat of imprisonment.

77.     The Plaintiffs and the other Cuban laborers were forced by Curaçao Drydock Company to perform dangerous and physically demanding work.  Specifically, the Plaintiffs and the other forced laborers cleaned, repaired and painted ships and oil platforms. The Plaintiffs worked in cramped settings.  They worked on scaffolds.  They worked with electricity in wet conditions.  They worked in stifling heat.  They worked suspended by ropes.  They were worked past the point of physical exhaustion.  Requests for rest were refused.

78.     Curaçao Drydock Company flouted safety regulations and paid little regard to the safety of Plaintiffs and the other forced laborers.  The Curaçao Drydock Company denied Plaintiffs and the other forced laborers any protections they might have under Curaçao labor

laws. If one were injured, Curaçao Drydock Company and its Cuban state agent would simply ship the worker back to Cuba. Many were injured, including Plaintiffs.

79.     On or about June 5, 2002, Alberto Justo Rodriguez Licea was badly injured while forced to work in the drydock. He had been ordered to hang suspended alongside the hull of a large ship, and scrape the rust from the seams in the steel hull. The system holding him was substandard and broke. He fell several stories. He broke his foot and ankle badly. He was not allowed to file any claim for his injury in Curaçao under the laws of that nation, but rather was immediately sent back to Cuba. When his foot and ankle had healed sufficiently to allow him to work, he was ordered back to work in the Curaçao Drydock Operation.

80.     In or around May of 2004, Plaintiff Fernando Alonso Hernandez burnt his hand while working in the drydock. He was welding steel to repair the drydock itself and, because he lacked sufficient safety equipment, he burnt his hand. He was not allowed to file any claim in Curaçao under the labor laws of that nation, but rather was immediately sent back to Cuba. When his hand had healed sufficiently to allow him to work, he was ordered back to work in the Curaçao Drydock Operation.

81.     In mid-December, 2005, at 5 a.m. one morning, near the end of one of his 16-hour shifts, Plaintiff Luis Alberto Casanova Toledo was ordered to enter tight quarters on a ship and work in water. 220-volt electricity was being used in the area against safety norms, and Mr. Casanova Toledo received a shock so severe that the electricity shot out his tongue, leaving him bleeding from it. Mr. Casanova Toledo, still recovering from the shock and with blood streaming down from his mouth and soaking his shirt, was ordered back to work to finish the last hours of his 16-hour shift.

82.     After working 16-hour days for more than 15 consecutive days, the Plaintiffs

would at times have a day in which they did not work. However, they were not allowed to

rest, but rather were forced to stay on the facilities of Curaçao Drydock Company, and, while

still physically and mentally exhausted from working, to watch videotapes of Fidel Castro's

rambling, hours-long speeches extolling the virtues of the Revolution. In forcing Plaintiffs to

watch these videotapes, Defendant and/or its agents or and/or co-conspirators intended to

humiliate and debase Plaintiffs, force them to act against their will and conscience, incite

their fear and anguish, and break their physical and/or moral resistance. Further the fact that

the Plaintiffs were not free to leave but had to watch these speeches highlighted the fact that

the Plaintiffs were victims of a totalitarian state, forced to do its bidding, and that the

Curaçao Drydock Operation was nothing more than an outpost of the Cuban totalitarian

state's forced labor camp system.

83.     On or about October 9, 2004, Plaintiff Alberto Justo Rodriguez Licea, risking

his life, imprisonment, persecution of his family, and being denied seeing his family back in

Cuba, escaped the Curaçao Dryock Operation forced labor camp.

84.     On or about January 7, 2005, Plaintiffs Fernando Alonso Hernandez and Luis

Alberto Casanova Toledo, risking their lives, imprisonment, persecution of their families,

and being denied seeing their families back in Cuba, escaped the Curaçao Dryock Operation

forced labor camp.

85.     After Plaintiffs Fernando Alonso Hernandez and Luis Alberto Casanova

Toledo escaped, Curaçao Drydock Company and/or its agents or and/or co-conspirators

printed and distributed "Wanted" flyers with photos of Plaintiffs Fernando Alonso

Hernandez and Luis Alberto Casanova Toledo. Curaçao Drydock Company and/or agents

and/or co-conspirators informed those to whom they delivered these "Wanted" flyers that the Plaintiffs Fernando Alonso Hernandez and Luis Alberto Casanova Toledo were dangerous escaped prisoners.

86.     Upon information and belief, Curaçao Drydock Company and/or its agents and/or co-conspirators threatened to kill Plaintiffs and incited others to kill Plaintiffs by stating that Plaintiffs were wanted "dead or alive".

87.     Curaçao Drydock Company and/or its agents and/or co-conspirators knew that Plaintiffs were not convicted criminals, that they were not dangerous, and that in fact they had only escaped to seek freedom from bondage and the forced labor that Curaçao Drydock Company and the Cuban state were subjecting them to. Further, Curaçao Drydock Company and/or its agents and/or co-conspirators knew that they did not have the legal authority that they purported to have in engaging in a manhunt. Curaçao Drydock Company and/or its agents and/or co-conspirators distributed the "Wanted" flyers and defamed the Plaintiffs to cause their unlawful arrests or murder, and/or to intimidate Plaintiffs.

88.     After the Plaintiffs escaped, security was increased at Curaçao Drydock Company's facilities to prevent other forced laborers from escaping. A number of the remaining forced Cuban laborers were forcibly taken to the airport with security personnel and sent back to Cuba where they were likely imprisoned because they were believed to be complicit in the Plaintiffs' escapes, or simply to make examples of them to discourage others.

89.     Plaintiffs surreptitiously made their way to a third nation. There, they still feared capture and return to Cuba's prison for having escaped the Curaçao Drydock Operation forced labor camp.

90.     The Plaintiffs went to a United States Embassy, and, on February 8, 2006, the

United States Government granted each of them a Significant Public Benefit Parole visa to allow them to enter the United States.

91.     Plaintiffs' families have been persecuted in Cuba as a result of Plaintiffs' escape from the Curaçao Drydock Operation forced labor camp.

### General Allegations

92.     At all times relevant to this Complaint, Curaçao Drydock Company and the Cuban government conspired to extract labor from the Plaintiffs and the other workers under threat of physical and/or psychological harm, including imprisonment.

93.     Curaçao Drydock Company both directly ordered the forced labor of Plaintiffs, and gave knowing practical assistance to the Cuban government in illegally compelling forced labor by, *inter alia*, entering into the scheme with the intent to compel forced labor, paying the Cuban government for the forced laborers, confining the forced laborers to a secured area, under guard, and under threat of imprisonment in Cuba should they try to escape or refuse any order to work, and ordering them to work under threat of imprisonment.

94.     The Curaçao Drydock Operation was a scheme to import Cuba's illegal forced labor practices into Curaçao so that Cuba and its co-conspirator Curaçao Drydock Company could profit from the exploitation of the Cuban workers while selling to the U.S. market.

95.     At all times relevant to this Complaint, Curaçao Drydock Company was aware that Cuba used means of state repression to compel labor from Cubans in violation of international law.

96.     The acts described herein were inflicted under the color of law and under color of official authority and/or in conspiracy or on behalf of those acting under color of

official authority, and were inflicted deliberately and intentionally.

97.     At all times relevant to this Complaint, Defendant was aware of the conditions of Plaintiffs' bondage and the fact that they were being forcibly detained and forced to work under threat of imprisonment.

98.     Defendant participated in, directed and/or authorized the tortious conduct resulting from the unlawful conspiracy to perpetrate the crime of forced labor.

99.     The Defendant's actions violated international law and were outside the legitimate scope of any duties as any official of any government.

100.    At all times relevant to this Complaint, forced labor was illegal according to treaty and customary international law as well as the laws of the Kingdom of the Netherlands and the Netherlands Antilles and Curaçao.

101.    The acts described herein were inflicted deliberately and intentionally.

102.    In the alternative, Defendant aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law, to wit, forced labor, by directly or indirectly providing support and funding to others with the intention or knowledge that those funds would be used to carry out an offense in violation of international law.

103.    The acts of aiding and abetting described herein included giving knowing practical assistance or encouragement that had a substantial effect on the perpetration of the torts alleged herein.

104.    Further, Defendant had knowledge that its actions would assist in the commission of the offences alleged herein.

105.    The acts and injuries to Plaintiffs described herein were part of a pattern and practice of systematic human rights violations designed, ordered, implemented and/or

directed by Defendant and its agents.

106.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have suffered and will continue to suffer physical injuries, pain and suffering, extreme and severe mental anguish and emotional distress; Plaintiffs have incurred and will continue to incur medical expenses; and, Plaintiffs have suffered and will continue to suffer a loss of their means of economic support.  Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

107.   The conduct of Defendant was malicious, fraudulent and/or oppressive and done with a willful and conscious disregard for Plaintiffs' rights and for the deleterious consequences of Defendant's actions. Consequently, Plaintiffs are entitled to punitive damages from Defendant.

### FIRST CLAIM FOR RELIEF

### (FORCED LABOR)

### [All Plaintiffs Against Defendant]

108.   The allegations set forth in all prior paragraphs of this complaint are realleged and incorporated by reference as if fully set forth herein.

109.   Defendant forced Plaintiffs to provide their labor to it for its private benefit under menace of the penalties of actual and threatened physical and psychological harm, *inter alia*, the penalty of false condemnation and/or imprisonment in Cuba.  The scheme perpetrated by Defendant also resulted in Plaintiffs being trafficked from the country of their residence, Cuba, to Curaçao.

110.   Defendant's perpetration of such trafficking and forced labor constitutes a crime in violation of the law of nations.  The crime of forced labor rests on a clear and

definite norm of international law that is universally accepted. The prohibition of forced labor is defined with a degree of specificity sufficiently comparable to international law violations that were familiar when the Alien Tort Statute was enacted.

111.    Various international instruments reflect the prohibition of forced labor.

112.    The Universal Declaration of Human Rights, G.A. Res. 217(A)III (1948) banned forced labor.

113.    The Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, and Charter of the International Military Tribunal, Aug. 8, 1945, art. 6, U.N.T.S. 280 made forced labor a war crime.

114.    In the Forced Labour Convention, 1930 (No. 29), Article 4, the member states agreed that they "shall not permit the imposition of forced or compulsory labour for the benefit of private individuals, companies or associations."

115.    Defendant's compulsion of labor from Plaintiffs does not fall under any of the exceptions to the prohibition of forced labor in the Forced Labour Convention, 1930 (no. 29), Article 2 or any other exception to the prohibition.

116.    Defendant's compulsion of labor from Plaintiffs was particularly egregious because it was part of a scheme to avoid the Cuban embargo's prohibition against trade between U.S. companies and Cuba.

117.    Defendant's compulsion of labor from Plaintiffs was particularly egregious because it provided hard currency to the Castro regime as well as lucre to Castro's inner coterie as reward for one of the most egregious aspects of the Castro regime – the forced labor camp.

118.    Defendant's compulsion of labor from Plaintiffs was particularly egregious

because it exported a practice of the Cuban totalitarian state into the free world for the purpose of private profit.

119.    Defendant directly perpetrated or aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law, to wit, forced labor.

120.    Although state action was involved in perpetrating the crime against Plaintiffs, forced labor is a modern variant of slavery to which the law of nations attributes individual liability such that state action is not required to give rise to liability under the Alien Tort Statute.

**WHEREFORE**, Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury arising out of serious physical and/or mental injuries, loss of consortium, loss of solatium, and/or loss of services, loss of income, and medical expenses, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again engaging in a scheme to compel labor, or from or from aiding and abetting, being accomplice to, conspiring to, participating in a joint venture to, and/or acting with reckless disregard as to acts of forced labor.

## SECOND CLAIM FOR RELIEF

### (Cruel, Inhuman, or Degrading Treatment)

### [All Plaintiffs Against Defendant]

121.    The allegations set forth in all prior paragraphs of this complaint are realleged and incorporated by reference as if fully set forth herein.

122.    Defendant subjected Plaintiffs to cruel, inhuman or degrading treatment in furtherance of forcing them to provide labor.

123.    The acts described herein had the intent and the effect of grossly humiliating and debasing plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and/or moral resistance.

124.    Plaintiffs were placed in great fear for their lives and forced to suffer severe physical and psychological abuse and agony. The acts described herein constitute cruel, inhuman or degrading treatment.

**WHEREFORE**, Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury arising out of serious physical and/or mental injuries, loss of consortium, loss of solatium, and/or loss of services, loss of income, and medical expenses, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again committing cruel, inhuman or degrading treatment, or from aiding and abetting, being accomplice to, conspiring to, participating in a joint venture to, and/or acting with reckless disregard as to acts of inhuman or degrading treatment.

### THIRD CLAIM FOR RELIEF

### (False Imprisonment)

### [All Plaintiffs Against Defendant]

125.    The allegations set forth in all prior paragraphs of this complaint are realleged and incorporated by reference as if fully set forth herein.

126.    Defendant falsely imprisoned Plaintiffs in furtherance of forcing them to provide labor.

127.    Defendant intentionally and unlawfully exercised force or the express or implied threat of force to restrain, detain or confine the Plaintiffs. The restraint, detention or

confinement compelled the Plaintiffs to stay or go somewhere against their will for some appreciable time.  The Plaintiffs did not consent to this restraint, detention or confinement.

128.    Defendant's actions constituted false imprisonment, actionable under the laws of Florida and constituted false imprisonment under the laws of the United States and the laws of the Kingdom of the Netherlands and Curaçao and the Netherlands Antilles.

**WHEREFORE**, Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury arising out of serious physical and/or mental injuries, loss of consortium, loss of solatium, and/or loss of services, loss of income, and medical expenses, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again committing false imprisonment, or from aiding and abetting, being accomplice to, conspiring to, participating in a joint venture to, and/or acting with reckless disregard as to acts of false imprisonment.

### FOURTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress)

### [All Plaintiffs Against Defendant]

129.    The allegations set forth in all prior paragraphs of this complaint are realleged and incorporated by reference as if fully set forth herein.

130.    Defendant intentionally inflicted emotional distress upon Plaintiffs in furtherance of forcing them to provide labor.

131.    The acts described herein constitute outrageous conduct against Plaintiffs and were without privilege.

132.    Defendant intended to cause Plaintiffs to suffer emotional distress, or, in the alternative, (a) Defendant engaged in the conduct with reckless disregard of the probability of causing Plaintiffs to suffer emotional distress, (b) the Plaintiffs were present at the time the outrageous conduct occurred and (c) the Defendant knew that the Plaintiffs were present.

133.    Plaintiffs suffered severe emotional distress and the outrageous conduct of the Defendant was a cause of the emotional distress suffered by Plaintiffs.

134.    Defendant's outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the laws of the United States, Florida, and the Kingdom of the Netherlands and Curaçao and the Netherlands Antilles.

**WHEREFORE**, Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury arising out of serious physical and/or mental injuries, loss of consortium, loss of solatium, and/or loss of services, loss of income, and medical expenses, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again committing the intentional infliction of emotional distress, or from aiding and abetting others to, being accomplice to, conspiring to, or participating in a joint venture to inflict emotional distress.

**FIFTH CLAIM FOR RELIEF**

**(Negligent Infliction of Emotional Distress)**

**[All Plaintiffs Against Defendant]**

135.    The allegations set forth in all prior paragraphs of this complaint are realleged and incorporated by reference as if fully set forth herein.

136.    Defendant negligently inflicted emotional distress upon Plaintiffs in furtherance of forcing them to provide labor.

137.    At all relevant times, Defendant owed Plaintiffs a duty to act with reasonable care, and/or injury to the Plaintiffs was reasonably foreseeable.

138.    At all relevant times, Defendant had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

139.    At all relevant times, Defendant knew, or reasonably should have known, that the conduct described herein would and did proximately result in physical and emotional distress to Plaintiffs.

140.    Despite said knowledge, power, and duty, Defendant breached its duty to Plaintiffs, and thereby negligently failed to act so as to stop engaging in the conduct described herein and to prevent or to prohibit such conduct or to otherwise protect Plaintiffs.

141.    As a direct and legal result of Defendant's wrongful acts, Plaintiffs have suffered and will continue to suffer significant injury, pain and suffering and extreme and severe mental anguish and emotional distress.

142.    Defendant's conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of Florida, the United States, the Kingdom of the Netherlands and Curaçao and the Netherlands Antilles.

**WHEREFORE**, Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury arising out of serious physical and/or mental injuries, loss of consortium, loss of solatium, and/or loss of services, loss of income, and medical expenses, plus interest, costs, and such other monetary

and equitable relief as this Honorable Court deems appropriate to prevent Defendant from committing the negligent infliction of emotional distress.

## SIXTH CLAIM FOR RELIEF

### (Negligence Per Se)

### [All Plaintiffs Against Defendant]

143. The allegations set forth in all prior paragraphs of this complaint are realleged and incorporated by reference as if fully set forth herein.

144. Defendant acted negligently in furtherance of extracting labor from or forcing Plaintiffs to provide labor.

145. Defendant failed to use ordinary or reasonable care in order to avoid injury to Plaintiffs. Defendant's negligence was a cause of injury, damage, loss or harm to Plaintiffs.

146. As a result of these acts, Plaintiffs suffered harm including, but not limited to, severe emotional distress. Defendant's conduct constitutes negligence and is actionable under the laws of Florida, the United States, the Kingdom of the Netherlands and Curaçao and the Netherlands Antilles.

**WHEREFORE**, Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury arising out of serious physical and/or mental injuries, loss of consortium, loss of solatium, and/or loss of services, loss of income, and medical expenses, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from committing negligence.

## SEVENTH CLAIM FOR RELIEF

### (Negligent Hiring)

30

**[All Plaintiffs Against Defendant]**

147. The allegations set forth in all prior paragraphs of this complaint are realleged and incorporated by reference as if fully set forth herein.

148. Defendant committed negligent hiring of individuals who forced Plaintiffs to provide labor.

149. On information and belief, Defendant selected, hired, retained and contracted individuals to run the Curaçao Drydock Operation.

150. Defendant failed to exercise reasonable care in selecting, hiring, retaining and contracting with others. At the time that Defendant selected, hired, retained and contracted with others to run the Curaçao Drydock Operation, and at all other relevant times, Defendant knew or reasonably should have known that these individuals would violate Plaintiffs' rights and that, as a direct and proximate result of those violations, the Plaintiffs would suffer injuries as alleged herein.

151. As a direct and proximate result of Defendant's negligent selection, hiring, retention and contracting with individuals to operate the Curaçao Drydock Operation, Plaintiffs have suffered and continue to suffer injuries entitling them to damages in amounts to be proven at trial.

**WHEREFORE**, Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury arising out of serious physical and/or mental injuries, loss of consortium, loss of solatium, and/or loss of services, loss of income, and medical expenses, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from committing negligent hiring.

## EIGHTH CLAIM FOR RELIEF

### (Negligent Supervision)

### [All Plaintiffs Against Defendant]

152.    The allegations set forth in all prior paragraphs of this complaint are realleged and incorporated by reference as if fully set forth herein.

153.    Defendant exercised negligent supervision of individuals who forced Plaintiffs to provide labor.

154.    When engaging in the wrongful conduct alleged herein, others supervised by Defendant were acting as the agents of Defendant.  Defendant exercised control over the operative details of the Curaçao Drydock Operation.

155.    Defendant knew or reasonably should have known that others supervised by Defendant would violate Plaintiffs' rights and the rights of all others similarly situated, and that, as a direct and proximate result of those violations, the Plaintiffs would suffer injuries as alleged herein.

156.    Defendant had the authority to supervise, prohibit, control, and/or regulate others hired by it to operate the Curaçao Drydock Operation so as to prevent these acts and omissions from occurring.

157.    Defendant knew or reasonably should have known unless it intervened to protect Plaintiffs and to properly supervise, prohibit, control and/or regulate the conduct described herein, those individuals that Defendant had hired to operate the Curaçao Drydock Operation would perceive their acts and omissions as being ratified and condoned.

158.    Defendant failed to exercise due care by failing to supervise, prohibit, control or regulate those individuals that Defendant had hired to operate the Curaçao Drydock

Operation. As a direct and proximate result of Defendant's negligent selection, hiring, retention and contracting with those individuals that Defendant had hired to operate the Curaçao Drydock Operation, Plaintiffs and all others similarly situated have suffered and continue to suffer injuries entitling them to damages in amounts to be proven at trial.

**WHEREFORE**, Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury arising out of serious physical and/or mental injuries, loss of consortium, loss of solatium, and/or loss of services, loss of income, and medical expenses, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from committing negligent supervision.

**NINTH CLAIM FOR RELIEF**

**(Racketeer Influenced and Corrupt Organizations Act)**

**[All Plaintiffs Against Defendant]**

159.    The allegations set forth in all prior paragraphs of this complaint are realleged and incorporated by reference as if fully set forth herein.

160.    The Curaçao Drydock Operation is an enterprise engaged in foreign commerce.

161.    Defendant is engaged in interstate acts of commerce and the acts alleged herein have a potential effect on commerce.

162.    Over a period of years, beginning in or about 1991 and continuing to the present, Defendant, with its joint venturers or co-conspirators or agents, in violation of 18 U.S.C. § 1962(b), through a pattern of racketeering activity, has acquired or maintained an

33

interest in or control of the Curaçao Drydock Operation, which is engaged in or affects interstate commerce.

163.    Over a period of years, beginning in or about 1991 and continuing to the present, Defendant, with its joint venturers or co-conspirators or agents, in violation of 18 U.S.C. §§ 1962(c) and (d), conspired to and did conduct the affairs of the Curaçao Drydock Operation through a pattern of racketeering activities.

164.    Over a period of years, beginning in or about 1991 and continuing to the present, Defendant, with its joint venturers or co-conspirators or agents, conducted or participated directly or indirectly in the conduct of the partnership joint venture through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961 (5) in violation of 18 U.S.C. § 1962(c).

165.    In particular, the conduct of Defendant, with its joint venturers or co-conspirators or agents, in forcing labor from Plaintiffs, constitutes a violation of 18 U.S.C. § 1589, which constitutes racketeering activity according to 18 U.S.C. § 1961 (1)(B) and specifically its reference to acts prohibited by 18 U.S.C. §§ 1581-1591 (relating to peonage, slavery and trafficking in persons).  18 U.S.C. § 1589 states:

> Whoever knowingly provides or obtains the labor or services of a person—
> (1) by threats of serious harm to, or physical restraint against, that person or another person;
> (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or
> (3) by means of the abuse or threatened abuse of law or the legal process, shall be fined under this title or imprisoned not more than 20 years, or both.

166.    Further, the conduct of Defendant, with its joint venturers or co-conspirators or agents, in obtaining Plaintiffs from Cuba to provide forced labor constitutes a violation of

18 U.S.C. § 1590, which constitutes racketeering activity according to 18 U.S.C. § 1961

(1)(B) and specifically its reference to acts prohibited by 18 U.S.C. §§ 1581-1591 (relating to

peonage, slavery and trafficking in persons).  18 U.S.C. § 1590 states:

> Whoever knowingly recruits, harbors, transports, provides, or obtains by any
> means, any person for labor or services in violation of this chapter shall be
> fined under this title or imprisoned not more than 20 years, or both. If death
> results from the violation of this section, or if the violation includes
> kidnapping or an attempt to kidnap, aggravated sexual abuse, or the attempt
> to commit aggravated sexual abuse, or an attempt to kill, the defendant shall
> be fined under this title or imprisoned for any term of years or life, or both.

167.    Further, the conduct of Defendant, with its joint venturers or co-conspirators

or agents, in threatening to murder Plaintiffs when they escaped constitutes racketeering

activity as defined in 18 U.S.C. 1961 (1)(A).

168.    Further, the conduct of Defendant, with its joint venturers or co-conspirators

or agents, in continually forcing Plaintiffs through fear, intimidation, and threat of

imprisonment to surrender their labor, constitutes a pattern of extortion, which is enumerated

as one of the racketeering activities in both 18 U.S.C. § 1961 (1)(A) and 18 U.S.C. § 1961

(1)(B) and specifically its reference to 18 U.S.C. § 1951, otherwise known as the Hobbs Act.

169.    Defendant, with its joint venturers or co-conspirators or agents, engaged in

such conduct in order to obtain profits for the enterprise through a considered disregard for

persons of Plaintiffs.

170.    Plaintiffs, each of them, were injured by the loss of income as a result of

Defendant's unlawful activity.  They did not receive income for their work.

171.    Defendant, with its joint venturers or co-conspirators or agents, through its

unlawful participation in the Curaçao Drydock Operation and forced labor, caused a

substantial effect on the United States by gaining an unfair advantage over competitors in the

drydock business in the United States. Specifically, drydock businesses in the United States that serve ships and oil platforms that sail or are stationed in the Gulf of Mexico and Caribbean regions lost business due to their inability to compete with the Curaçao Drydock Company's prices because the Curaçao Drydock Operation used forced Cuban labor.

172. Defendant, with its joint venturers or co-conspirators or agents, through its unlawful participation in the Curaçao Drydock Operation and forced labor, also caused a substantial effect on the United States by circumventing the Cuban embargo. The Cuban embargo's specific purpose is to deny the Cuban regime financial support and protest the Cuban totalitarian state's repression of its people, including its use of forced labor in violation of international law. Curaçao Drydock Company's acts of using forced Cuban laborers to work on American ships and oil platforms, while paying the Cuban government directly for the laborers, undercut United States law and policy, and thus negatively impacted the United States.

**WHEREFORE**, Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury arising out of serious physical and/or mental injuries, loss of consortium, loss of solatium, and/or loss of services, loss of income, and medical expenses, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again engaging in racketeering, including racketeering in furtherance of extracting labor or forced labor in violation of the law of nations.

## PRAYER FOR RELIEF

WHEREFORE, each and every Plaintiff prays for judgment against Defendant as follows:

(a) for compensatory damages;

(b) for punitive damages;

(c) for costs of suit, attorneys fees and such other relief as the Court deems

just and proper.

## JURY TRIAL DEMANDED

A jury trial is demanded on all issues that may be tried to a jury.

Dated this 24th day of August, 2006

JOHN ANDRES THORNTON, PL
John Andres Thornton
(Florida Bar No. 0004820)
johnandresthornton@hotmail.com
9 Island Avenue, #2005
Miami Beach, FL 33139
Tel.: (305) 532-6851
Fax: (305) 538-1070

**JS 44** (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

Alberto Justo Rodriguez Licea, Fernando Alonso Hernandez, and Luis Alberto Casanova Toledo

**06**

**(b)** County of Residence of First Listed Plaintiff   **Miami-Dade**
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

JOHN ANDRES THORNTON, PL
9 Island Avenue, #2005
Miami Beach, FL 33139, Tel.: (305) 532-6851

## DEFENDANTS

Curaçao Drydock Company, Inc., a/k/a Curaçaose Dokmaatschappij NV, a/k/a CDMNV

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys (If Known)

**CIV-KING**

**MAGISTRATE JUDGE GARBER**

**(d)** Check County Where Action Arose:   ☑ MIAMI- DADE   ☐ MONROE   ☐ BROWARD   ☐ PALM BEACH   ☐ MARTIN   ☐ ST. LUCIE   ☐ INDIAN RIVER   ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☑ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☑ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☑ 360 Other Personal | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | ☐ 730 Labor/Mgmt.Reporting | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Security Act | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Re-filed- (see VI below)
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO      b) Related Cases ☐ YES ☑ NO

JUDGE                              DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

LENGTH OF TRIAL via __10__ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23     DEMAND $     CHECK YES only if demanded in complaint:     JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE   Aug. 24 2006

FOR OFFICE USE ONLY
AMOUNT $ 350.00   RECEIPT # 74584 3   IFP 8/24/06